In re Clarence TAYLOR, Debtor.

Clarence TAYLOR, Plaintiff,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION and Edward Sparkman, Trustee, Defendants.

Bankruptcy No. 88–11042S.
Adv. No. 88–2081S.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 1, 1989.

David Searles, Community Legal Services, Inc., Philadelphia, Pa., for debtor/plaintiff.

David B. Comroe, Rebecca Landes, Philadelphia, Pa., for defendant/FNMA.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 trustee/defendant.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The instant case presents a rather bold attempt by a Chapter 13 debtor who is a post-petition co-grantee of a premises to

utilize 11 U.S.C. § 506(a) of the Bankruptcy Code to reduce the secured portion of a potential claim of the mortgagee of the premises against him. As this effort is fraught with pitfalls and a lack of equities in favor of the Debtor, we shall deny the relief sought.

The Debtor, CLARENCE TAYLOR, filed the underlying Chapter 13 case on March 30, 1988. On April 4, 1988, a sheriff's sale of the premises at 2736 North Reese Street, Philadelphia, Pennsylvania 19133 (hereinafter referred to as "the Premises"), in which the Debtor was then residing with his mother, Lucille Taylor (hereinafter "the Mother"), and his uncle, Donald J. Taylor (hereinafter "the Uncle"), was scheduled by the mortgagee of the Premises, FEDERAL NATIONAL MORTGAGE ASSOCIATION (hereinafter "FNMA"), pursuant to a foreclosure judgment. Although the premises was on that date titled to the Debtor's late grandparents, Theodore O. Rockafellow and Gertrude Rockafellow, and the Uncle, and these parties were the sole mortgagors, the Debtor was apparently successful in convincing the sheriff and/or FNMA that his bankruptcy filing stayed the sheriff's sale.

On September 7, 1988, FNMA filed a motion to obtain relief from the automatic stay pursuant to 11 U.S.C. § 362(d). Apparently laboring under the logical but erroneous assumption that the debtor in this case was the surviving mortgagor of the premises, FNMA captioned the motion "In re DONALD J. TAYLOR," although reciting thereon the number of the instant case.[1] FNMA also proceeded to serve the Uncle with this motion, as if he were the Debtor. The Debtor answered the motion by claiming that *he* had never been served.

On September 23, 1988, the Debtor filed the instant adversary proceeding. Identifying himself as "the residential owner" of the premises, but not reciting any chain of title, the Debtor therein averred that FNMA held a mortgage dated August 31, 1971, on the Premises; that FNMA "has filed or will file a proof of claim in the

matter in the approximate amount of $6,851.13;" and that the fair market value of the premises was but $3,000.00. Therefore, by invocation of 11 U.S.C. § 506(a), which reads as follows, the Debtor sought to reduce FNMA's alleged secured claim against him to $3,000.00:

§ 506. Determination of secured status.

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

FNMA answered the Complaint on October 21, 1988. Therein, it admitted the existence of the mortgage; asserted that it had filed a proof of claim in the amount of $4,351.40; and denied the averment as to the value of the premises.

The hearing on the § 362(d) motion was continued to December 1, 1988, the original date on which the adversary proceeding was set for trial. At the joint request of the parties, we continued both hearings until January 5, 1989, but entered an Order stating that this would be the last continuance. Nevertheless, on January 5, 1989, FNMA requested *another* continuance, due to its alleged "inability" to hire an appraiser and illness of counsel. We granted one further continuance, to January 10, 1989, only on the basis of the illness of counsel, indicating that, since the matter had been pending for over three months, a further

1. Such an assumption may have caused FNMA to acquiesce in the Debtor's assertion that the

automatic stay halted the April 4, 1988, sheriff's sale.

delay to engage an appraiser would not be accorded.

At the hearing finally conducted on January 10, 1989, we initially expressed our intention to dismiss the § 362(d) motion because FNMA had admittedly *still* not served the Debtor himself therewith. *See* Bankruptcy Rule 7004(a)(9) and Local Bankruptcy Rule 9014.1(d)(2). The only witness at the remaining hearing on the adversary proceeding, based upon § 506(a), was the Debtor.

During his testimony, the Debtor produced a Deed dated July 21, 1988, by which the Uncle had conveyed the Premises to the Debtor and the Mother for a recited (and actual) consideration of $1.00. When asked the reason for the conveyance, the Debtor articulated (1) a desire to keep the Premises in the family; and (2) the Uncle's incarceration. The Uncle, however, had been incarcerated in 1983 and was *released* just *before* the conveyance. The Deed was not recorded, apparently due to the financial inability of any of the parties thereto to pay the transfer taxes. The Debtor, a resident of the Premises since 1983, claimed that he had attempted to make several recent payments to FNMA, but that these had been mailed back to him.

Most of the remainder of the Debtor's testimony was devoted to describing the condition of the Premises. Although the principal amount of the underlying mortgage of August 31, 1971, was $6,850.00, and the City had assessed the premises at $5,000.00, the Debtor claimed that it was only worth $3,000.00 to $3,500.00. His basis for this valuation was his contention that the value of the Premises had deteriorated since its purchase in 1971 due to electric problems, roof leaks, poor water pressure, a defective toilet, and a severe need for internal redecorating.

At the close of the hearing, we indicated an intention to enter an Order, ultimately memorialized on January 11, 1989, denying the § 362(d) motion and allowing Briefs to be filed on January 24, 1989 (Debtor's Opening); February 7, 1989 (FNMA); and February 10, 1989 (Debtor's Reply). Although this is an adversary proceeding, we do not believe that it is necessary to recite separate findings of fact because our disposition against the Debtor is based upon purely issues of law.

Before plunging into discussion of the merits of the proceeding before us, we note several post-trial developments. First, on January 17, 1989, FNMA filed a new motion for relief pursuant to 11 U.S.C. § 362(d), this time identifying the Debtor accurately and presumably properly serving him with the motion. Secondly, on February 1, 1989, the Debtor filed an Application for Removal to this court of the state-court foreclosure action against his grandparents and the Uncle which underlay the foreclosure judgment and sheriff's sale. In that matter, he had filed a motion to intervene as a party defendant and attempt to strike the default judgment entered therein, which motion had not yet been in the state court at the time of removal. Both of these proliferations of the present controversy are currently listed for hearings on March 30, 1989.

Further, on December 29, 1988, when the Debtor's Chapter 13 Plan could not be confirmed at the first scheduled Confirmation Hearing on December 15, 1988, the Standing Chapter 13 Trustee filed a motion to dismiss the case because the Debtor had fallen in arrears on his modest plan payments of $72.00 monthly. We ultimately continued both the hearings on both Confirmation and the Motion to dismiss until March 30, 1989. We emphasize, in our accompanying order, that the Trustee's motion listed for March 30, 1989, will *not* be continued.

Finally, upon reviewing the court files, we were unable to locate *any* evidence that a Proof of Claim had in fact been filed on behalf of FNMA in this case, either in the case file or on the Claims Docket, despite FNMA's assertion, in its Answer, that it had filed a Claim in the amount of $4,351.40. After a conference call with counsel on February 15, 1989, we ascertained that this was probably because FNMA had captioned this filing by reciting thereon the non-existent bankruptcy case of "Donald J. Taylor." This error was

consistent with FNMA's erroneous assumption expressed in its original § 362(d) motion that, since the Uncle was the surviving mortgagor, this bankruptcy case must have been filed on *his* behalf. The Proof of Claim recited the $4,351.40 figure, $2,648.40 of which was identified as "Arrearages" and $1,703.00 of which is attributed to "Atty fees/costs." [2]

The original Brief of the Debtor devotes a little more than a page to legal argument. After accurately noting that 11 U.S.C. § 1306(a)(1) probably supports the conclusion that the Premises is property of the Debtor's estate, the Debtor cites his only case authorities, for the principle of doubtful relevance to the matter at hand that the Debtor's interest in the premises is protected by the automatic stay, *e.g., In re Capodanno,* 83 B.R. 285, 288–89 (Bankr.E.D.Pa. 1988); and *In re Black,* 58 B.R. 60, 61 (Bankr.E.D.Pa.1986).

FNMA responds with essentially three arguments: (1) The purported transfer of the premises from the Uncle to the Debtor and his Mother was a fraudulent conveyance. It is therefore suggested that we should disregard it entirely or impose a constructive trust of the Premises for FNMA's benefit. *See, e.g., Peterson v. Dickison,* 344 F.Supp. 551, 553–54 (W.D. Pa.1971); and *In re American International Airways, Inc.,* 44 B.R. 143, 145–48 (Bankr.E.D.Pa.1984); (2) By taking "judicial notice" of a wide variety of matters, including the 1971 mortgage, the purportedly low assessment-to-value ratio in the City of Philadelphia, and the increase in the Consumer Price Index since 1971, we can deduce that the valuation attested to by the Debtor is far too low; and (3) Since the Mother is a co-grantee on the deed of July 21, 1988, the Debtor is only able to invoke § 506(a), if at all, as to his purported half-interest in the property. *See In re Crompton,* 68 B.R. 831, 834–36 (Bankr.E.D.Pa. 1987).

▉ In his Reply Brief, the Debtor attacks the fraudulent conveyance argument on a number of grounds, including FNMA's failure to plead same or to establish any way in which it was damaged by the Debtor's purported fraud.[3] The attempt by the Debtor to invoke § 506(a) is analogized to our holding in *In re Chandler,* 77 B.R. 513, 517–19 (Bankr.E.D.Pa. 1987), *aff'd,* C.A. No. 87–6516 (E.D.Pa. March 30, 1988) [1988 WL 34921], in which we concluded that 11 U.S.C. § 522(f)(1) could be utilized to attack judicial liens that arose prior to the debtors' obtaining full title to their exempt realty. The Debtor is willing to apply *Crompton* to conclude that the Debtor's estimate of value should be halved in calculating his interest in the property in issue.[4]

---

2. The failure of the Proof of Claim or any other document in the record to recite the total amount of FNMA's claim renders a § 506(a) analysis impossible. It is only "an allowed claim" of a secured creditor which is subject to treatment under § 506(a). A demand for mortgage arrearages is not a "claim." *See, e.g., In re Vitelli,* 93 B.R. 889, 894–95 (Bankr.E.D.Pa.1988); and *In re Small,* 65 B.R. 686, 690–91 (Bankr.E. D.Pa.1986), *aff'd,* 76 B.R. 390 (E.D.Pa.1987).

3. In light of the vague contents of the Complaint on the obviously problematical issue of how the Debtor became owner of the premises, we are disinclined to penalize FNMA for lack of specificity in pleading its defenses in its Answer. It is apparent that, in its Answer, FNMA contested the validity of the Debtor's claim of title.

4. The Debtor does not comment about the gross attempt of FNMA to overwork the concept of judicial notice. The Debtor's own invocation of the mortgage in his Complaint would prompt us to accept its contents into the record despite our contrary ruling at trial. *See* Federal Rule of Evidence (hereinafter "FRE") 1005. However, we clearly cannot take judicial notice of such doubtful matters as the assessment policies of the City of Philadelphia and the rate of inflation, as these are not facts "generally known" or "capable of accurate and ready determination." *See* FRE 201(b).

As far as the issue of the value of the property is relevant, we note that the Debtor's status as a colorably-part-owner renders him competent to present testimony as to value. *See, e.g., In re Corbett,* 80 B.R. 32, 36 (Bankr.E.D.Pa.1987); and *In re Blakey,* 76 B.R. 465, 469, *modified,* 78 B.R. 435 (Bankr.E.D.Pa.1987). It is far from clear that the Premises has not considerably deteriorated and therefore declined in value since 1971. It is doubtful that any City evaluation would take such deterioration into account. Without rendering any finding as to value, we would observe that it is likely that the mortgage balance does exceed the value and that FNMA would be well-advised, from an economic stand-

Thus, the parties raise many issues. However, neither party focuses on the specific language and requirements of § 506(a), and neither cites to any of what we believe are the most factually analogous cases, *i.e.*, those cases in which courts have been confronted with grantee-debtors asserting ownership rights in other contexts, usually in defending § 362(d) motions. *See In re McLaughlin, McLaughlin v. Fireman's Trust Mortgage Co.*, 96 B.R. 554, 556–57, (Bankr.E.D.Pa.1989) (Opinion addresses a request by the debtor's counsel for attorneys' fees pursuant to 11 U.S.C. § 362(h) after a mortgagee attempted to conduct a sheriff's sale of property transferred to the debtor without first obtaining relief from the automatic stay despite the awareness of grantee-debtor's bankruptcy filing); *In re Rorie*, Bankr. No. 88–11097F (Bankr.E.D.Pa. Dec. 21, 1988); *In re Everhart*, 87 B.R. 35 (Bankr.N.D.Ohio 1988) (arises in context of objections of a mortgagee to a Chapter 13 plan of a grantee-debtor seeking to cure arrears on the mortgage of her grantor); *In re Kelly*, 67 B.R. 508 (Bankr.S.D.Miss.1986); *In re Nelson*, 66 B.R. 231 (Bankr.D.N.J.1986), *aff'd*, C.A. No. 86–3724 (D.N.J. May 4, 1987), *aff'd*, 838 F.2d 1207 (3d Cir.1988); *In re Rye*, 54 B.R. 180 (Bankr.D.S.C.1985); and *In re Green*, 42 B.R. 308 (Bankr.D.N.H.1984).

In many of the foregoing cases, the grantee-debtors provided far more compelling factual situations than that related by the Debtor in the instant case. For instance, in *Kelly*, the grantee-debtor and her family had been the sole occupants of the premises in issue and had made all of the mortgage payments for the past eight years. The debtor contended that the mortgagor was merely a straw party, utilized because the mortgagee allegedly refused to grant mortgages to single women. The transfer to the debtor occurred shortly before the bankruptcy filing. The debtor's Chapter 13 plan, contemplating a cure of the mortgage delinquency, had already been confirmed. Nevertheless, holding

that "no debtor-creditor relationship" existed between the debtor and the mortgagee, the court concluded that the mortgagee was entitled to relief from the stay *and* from the terms of the confirmed plan, and granted § 362(d) relief to the mortgagee. 67 B.R. at 514.

The facts in *Green* were somewhat less compelling than in *Kelly*. The grantee-debtors there had purchased the premises in an arms-length transaction, secreted because of the presence of a "due on sale" clause in the mortgage.[5] The debtors' attempt to stand in the shoes of their transferor and cure a mortgage arrearage, despite having held an unrecorded deed and having made payments for two years, was rejected in light of the court's observation that the "due on sale" provision rendered the entire balance due. 42 B.R. at 309. The court was, in addition, troubled by the debtors' "unclean hands" arising from their attempt to evade the terms of the "due on sale" clause. *Id.* at 309–10.

The facts and results of *Rye* and *Nelson* were similar and also are of little comfort to the Debtor here. In *Rye*, the father of the husband-debtor deeded the property to the debtors twelve days before they filed bankruptcy. The court held that "[o]nce the creditor establishes that the transfer of the distressed property was in close proximity to the filing of the debtors' petition for relief, the burden is on the debtors to establish good and sufficient reason why relief from the automatic stay should not be granted." 54 B.R. at 182. Finding this burden unmet, the court granted relief.

*Nelson* presented a similar deed-and-filing sequence, but added were the equities, in favor of the debtor, that the debtor and her seven dependent children had resided in the premises and made all of the mortgage payments for over six years. Yet, the result was the same as in *Rye*. The "bad faith filing" of the bankruptcy in proximity to the debtor's coming into title was held

---

point, to allow the Debtor and his family to remain in the premises if they agree to liquidate the entire mortgage balance.

5. In the telephone conference call of February 15, 1989, FNMA's counsel conceded that there was no "due-on-sale" clause in the August 31, 1971, mortgage. We have found none.

sufficient to justify relief from the automatic stay under 11 U.S.C. § 362(d)(1). Like the court in *Rye*, the *Nelson* court relied upon a line of Chapter 11 cases where pre-filing transfers to newly-created entities were held to taint cases with "bad faith." *In re Thirtieth Place, Inc.*, 30 B.R. 503 (Bankr. 9th Cir.1983); *In re Yukon Enterprises, Inc.*, 39 B.R. 919 (Bankr.C.D. Cal.1984); and *Duggan v. Highland–First Avenue Corp.*, 25 B.R. 955 (Bankr.C.D.Cal. 1982).

The courts were more receptive to the position of the respective grantee-debtors in *Everhart, Rorie,* and *McLaughlin.* In *Everhart*, however, the conveyance from the mortgagors to their daughter, the debtor, occurred over eight years before the payment delinquency which triggered the bankruptcy. The mortgagee had not only accepted payment from the debtor in this interim, but it had affixed her name to the payment books and coupons in the transaction. In such circumstances, the court concluded that the mortgagee had "continuously looked to the Debtor for payments" and that hence the contention that it was not a creditor "pales in the face of fundamental fairness." 87 B.R. at 37, 38. Therefore, the court confirmed a plan which contemplated the debtor's curing the mortgage delinquency.

*Rorie* and *McLaughlin* also contained the elements of a long period of continuous residence with payments on the part of the respective grantee-debtors (*Rorie*, 13 years; *McLaughlin*, 16 years). Although the deed transfers were just prior to (and, in the *McLaughlin* matter, after) the bankruptcy filings, the deeds were duly recorded and there was evidence of a clear understanding in each case between the grantor-mortgagor and the grantee-debtor that the latter was, at all pertinent times, the equitable owner of the premises.

■ The reactions of the courts to the analogous factual circumstances in these cases are helpful in our application of § 506(a) to the facts at hand. The parties do make some points in the Briefs, albeit that they fail to relate very clearly to § 506(a). We agree with the Debtor that

his interest in the premises is property of the estate protected by § 362. However, that does not necessarily mean that the Debtor will be able to withstand a motion based upon § 362(d)(1)—or utilize § 506(a). FNMA's contention that there is an air of undue contrivance about the matter appears accurate, but the argument based upon fraudulent conveyance law seems misplaced. A fraudulent conveyance is merely voidable, not void, and no efforts have been made by any interested party to attack the conveyance of the Uncle to the Debtor and the Mother. A constructive trust was imposed, in the *Peterson* case, as to the *transferor*, not a creditor of the transferor. Therefore, we question whether any constructive trust may be imposed upon the Debtors in favor of *FNMA* here. We also question whether these facts are relevant to the outcome of a proceeding under § 506(a).

■ There is some surface appeal in the Debtor's attempt to analogize this case to *Chandler.* However, there is a clear distinction in the facts: the *Chandler* debtors permitted to utilize § 522(f)(1) to avoid judicial liens obtained against their mother-grantor had been, prior to the conveyance to them, beneficial owners of the premises under a trust held in their names by their mother. 77 B.R. at 519. More importantly, the operation of § 522(f)(1) is similar to, but not identical with, that of § 506(a). *See generally In re Mays*, 85 B.R. 955, 962 (Bankr.E.D.Pa.1988), *aff'd*, C.A. No. 88–4306 (E.D.Pa. August 1, 1988) [1988 WL 81716]. Section 506(a) requires a court to value the "creditor's interest in the estate's interest" in the property which is the focal point of the proceeding. Thus, it must be assumed that there is a debtor-creditor relationship between the debtor utilizing § 506(a) and the creditor which is the target of a § 506(a) motion. *See* 3 COLLIER ON BANKRUPTCY, ¶ 507.04, at 506–20 to 506–21 (15th ed. 1988). We doubt whether a unilateral transaction between a grantor-mortgagor and a grantee-debtor can bind the mortgagee to accept the grantee-debtor as a mortgagor. If this were the case, frustrated mortgage applicants could sim-

ply employ straw parties to obtain realty loans for them and, by the medium of post-mortgage conveyances, compel mortgagees to accept such rejected applicants as their mortgagors.

This need for a debtor-creditor relationship between the parties in a § 506(a) proceeding distinguishes this case from *Chandler*. There is nothing in § 522(f)(1) which, in our view, makes such a relationship a prerequisite.

█ While the debtor-creditor relationship issue occasionally surfaces in several of the grantee-debtor cases cited *supra, e.g., Everhart, supra,* 87 B.R. at 36–38; and *Kelly, supra,* 67 B.R. at 513–14, many of the cases approach the grantee-debtor issue as a question of whether the transfer or even the entire underlying bankruptcy filing by the grantee-debtor was "in good faith." *E.g., Rorie,* slip op. at 7–13; *Nelson,* 66 B.R. at 234–37; and *Rye,* 54 B.R. at 181–82. We are reluctant to employ this reasoning, since we do not believe that there is any "good faith" requirement as a condition to the *filing* of a Chapter 13 case, as opposed to the confirmation of a Chapter 13 plan. *See* 11 U.S.C. § 1325(a)(3). *Comare In re Ford,* 78 B.R. 729, 733 (Bankr.E.D.Pa.1987); and *In re Flick,* 14 B.R. 912, 916 (Bankr.E.D.Pa. 1981), *with In re Gathright,* 67 B.R. 384, 387–91 (Bankr.E.D.Pa.1986), *appeal dismissed,* 71 B.R. 343 (E.D.Pa.1987). *Cf. In re 1606 New Hampshire Ave. Associates,* 85 B.R. 298, 308 (Bankr.E.D.Pa.1988) (Chapter 11 case); and *In re Latimer,* 82 B.R. 354, 363 (Bankr.E.D.Pa.1988) (Chapter 7 case).

█ If the use of "good faith" in this context merely means that the courts must take a good, hard look at the equities in grantee-debtor cases before allowing grantee-debtors to take full advantage of all provisions of the Bankruptcy Code, then we can agree that such an analysis is appropriate. The equities in the factual context in which § 506(a) is invoked can be relevant to a decision as to whether and how it is to be used. *Compare Mays, supra,* 85 B.R. at 962–74 (debtor not permitted to invoke § 506(a) to utilize a "van-

ishing lien" to reduce the amount of a creditor's claim).

█ We believe that, in order to successfully invoke § 506(a) in a grantee-debtor context, in which the debtor had no direct contractual relationship with the secured creditor that is the target of the § 506(a) proceeding, several factors must be considered. We further hold that, to succeed in invoking § 506(a), the grantee-debtor has the burden of establishing that all or at least most of these factors establish equities in his or her favor.

The factors which we believe are relevant are as follows: (1) the timing and manner of the transfer; (2) the reasons for the transfer; (3) the length of time that the debtor has resided or utilized the premises; (4) the consideration for the transfer; (5) the number and amount of payments made on the mortgage by the grantee-debtor; and (6) whether the mortgagee has engaged in any conduct which indicates an acceptance of the debtor as mortgagor. It is totally proper that the debtor have the burden as to the first five factors, as these are matters almost exclusively within the control of the debtor-grantee, and not the mortgagee, to prove. *See, e.g., In re Jordan,* 91 B.R. 673, 684 (Bankr.E.D.Pa.1988); *In re Crompton,* 73 B.R. 800, 808–09 (Bankr.E.D.Pa.1987); and *In re Furlow,* 70 B.R. 973, 978 (Bankr.E.D.Pa.1987).

█ When we apply the above factors to the instant facts, the Debtor here comes up short. The timing and manner of the transfer is worse than in any of the foregoing cases. Not only was the deed executed *post*-petition, but it has not been perfected by recording even to date. The deed is therefore effective only as to the immediate parties to it and could be easily disavowed or destroyed at any time. This factor weighs heavily against the debtor.

The reasons articulated by the Debtor for the transfers were lame. As a result, we are left with a strong suggestion that the transfer was motivated by the worst of all possible reasons, *i.e.,* solely to attempt to invoke § 506(a). The reasons for the transfer given by the Debtor were that the

Uncle was incarcerated and in order that the premises could be kept in the Debtor's family for another generation. As FNMA points out, the first reason is nonsensical, given the fact that the premises remained in the Uncle's name while he languished in prison for five years, and was apparently transferred only after the Uncle was released. The fact that the Uncle (age 46 or 47) transferred the premises to the Mother (age 55) as well as to the Debtor (age 38) would appear to undermine any testamentary aspect of the transaction. Clearly, the facts of this case in this regard are a far cry from those of *McLaughlin,* where the Debtor testified to a plausible and convincing reason, *i.e.,* obtaining legal title to a premises which was placed in her parents' names simply to prevent her estranged husband from obtaining any interest in the premises. 96 B.R. at 557. Rather, it seems clear that, here, the motivating factor of the transfer was to attempt to put the Debtor's bankruptcy to use in not only forestalling a sheriff's sale, but reducing the mortgagee's claim against the Premises. The only fact causing us to refrain from making a positive finding that use of § 506(a) was the sole motivating factor of the transfer is that it would not explain including the Mother as a grantee. However, on his part, the Debtor failed to convince us of any logical reason for the transfer independent from an intention to manipulate the Bankruptcy Code in his favor.

The third factor does not cut strongly in the Debtor's favor, either. He testified that he has resided in the premises since 1983. The grantor, who *was* absent from the premises, now lives there, too. Clearly, it is not a case, as in *McLaughlin, Rorie,* and *Everhart,* where the debtor-grantee is and has been, for the entire duration of the mortgage, the sole occupant of the premises.

Consideration of the fourth factor also fails to aid the Debtor. Clearly, the consideration was nominal, suggesting, again,

that the transaction was contrived by the expediency of desire to unfairly utilize the Bankruptcy Code to FNMA's detriment.

The fifth factor is the first which implicates the mortgagee, by exploring its relationship with the debtor-grantee. In our view, the Debtor stumbles badly on this point. Although he claimed to have sent payments to FNMA in 1988, apparently for the first time in his five-year residency in the Premises, he admitted that all of the payments have all been sent back. The Debtor's poor Plan-payment record suggests that these alleged returned payments have not been and will not be applied to the mortgage delinquency. Thus, the sum total of the Debtor's payment-history, in over five years' residence in the premises, is that he has never made a payment and apparently has no payments saved toward this end. The record here as to this factor compares most unfavorably with *McLaughlin, Rorie,* and *Everhart,* and even with cases such as *Kelly* and *Green,* in which the grantee-debtors made substantial mortgage payments for years and nevertheless failed to prevail in defending against even a § 362(a) motion.

▮▮▮ Finally, we can detect few, if any, indicia that FNMA has accepted the Debtor or the Mother as its mortgagor(s). Certainly, the "smoking gun" of issuing a payment book and coupons in the name of the grantee-debtor, as in *Everhart,* is not present. Admittedly, here, no payments were accepted by FNMA from the Debtor. The only act of acceptance of the Debtor as mortgagor by FNMA which might be argued to have occurred here was the filing of a Proof of Claim in this case by FNMA. However, it will be recalled that, in doing so, FNMA placed the name of "Donald J. Taylor" on the Proof of Claim. While this appears to have been more in the nature of an error than a conscious protest, it does indicate a recognition of the Uncle only as a mortgagor of the premises.[6] This errone-

---

**6.** We also note that the fact that the Proof of Claim recites arrearages only is more than a technical problem, and in itself precludes the Debtor's invocation of § 506(a). This Code provision can only be employed to attack a *proof of*

*claim* of a creditor. *See* 3 COLLIER, *supra,* ¶ 506.04, at 506–15 to 506–16; and page 2 n. 1 *supra.* The Debtor could have resolved this problem by filing a proof of claim on behalf of FNMA, in light of FNMA's failure to file an

ous captioning of the claim is also consistent with FNMA's misdesignation of the Debtor on its original § 362(d). It therefore appears to be an indication that only the Uncle was recognized by FNMA as the mortgagor of the premises.

Therefore, we conclude that none of the factors which we believe must be considered in determining whether the equities favor allowing a grantee-debtor to utilize § 506(a) to attack a proof of claim filed by his grantor's mortgagee cut in the Debtor's favor here. We thus have no alternative but to dismiss the Debtor's Complaint.

In so doing, we emphasize the narrow scope of our holding. We are only ruling on the § 506(a) issue, because that is all that is before us. Whether we would use the same factors as we use here or whether we would weigh them differently in analyzing the § 362(d) issue or in the Plan-confirmation context is a clear possibility. The Debtor is seeking a dispensation allowed to only certain parties under the Code in invoking § 506(a) to reduce FNMA's claim. The doubtful status of FNMA as the Debtor's creditor is highly relevant in the context of a § 506(a) complaint. However, if we are faced with depriving three middle-aged and apparently needy individuals of their shelter in the context of a § 362(d) motion, different consequences may ensue. Surely, we would look favorably upon a plan to pay off FNMA's entire mortgage balance, which may indeed be more than FNMA could ever hope to realize from a foreclosure sale of this obviously decrepit home from any quarter, including the Debtor. It seems apparent that the Uncle, just having returned to free society after five years of incarceration, is, if anything, a more chancy credit risk for FNMA as mortgagor than the Debtor and the Mother.

Therefore, we will enter a judgment against the Plaintiff–Defendant in this proceeding only, with the caveat that this conclusion carries little weight in the other, related matters before us in this case. In our Order, we will underscore only the actual proof of claim. *See* 11 U.S.C. § 501(c). His failure to do so would appear to independently require dismissal of this proceeding.

requirement that the Debtor make up and/or maintain his payments by March 30, 1989, to avert dismissal of his underlying bankruptcy case.